T.C. Summary Opinion 2011-22

UNITED STATES TAX COURT

TODD D. BAILEY, JR. AND PAMELA J. BAILEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28706-09S.          Filed March 2, 2011.

<u>Kurt C. Swainston</u>, for petitioners.

<u>Eugene Kim</u>, for respondent.

PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard
pursuant to the provisions of section 7463 of the Internal
Revenue Code in effect at the time the petition was filed.
Pursuant to section 7463(b), the decision to be entered is not
reviewable by any other court, and this opinion shall not be
treated as precedent for any other case.  Unless otherwise
indicated, subsequent section references are to the Internal

Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a $19,358 deficiency in petitioners' Federal income tax for 2004. After stipulation, the sole issue for decision is whether for 2004 petitioners are entitled to deduct a net loss of $16,822 from two single-family rental properties that they owned.

<u>Background</u>

I. <u>General Background</u>

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in California at the time the petition was filed. Petitioner husband worked as an emergency physician during 2004. His income and deductions are not at issue except to the extent that his 2004 earnings of $212,200 caused the couple to encounter an itemized deduction phaseout with respect to their 2004 Federal income tax return.

During 2004 petitioner wife (petitioner) did not earn a salary. Instead, she operated three rental properties that the couple owned jointly. Petitioner's father was a builder. Her mother worked with her father as a bookkeeper and an interior decorator. This upbringing gave petitioner an "eye" for the housing market, and experience with building codes, architectural

plans, and subcontractors. Beginning around 1980 and using mortgage financing and joint funds with petitioner husband, petitioner continuously was in the market to purchase property with potential for either resale or conversion into income-producing property.

Following this pattern, during 2004 petitioner negotiated the purchase of a fourth single-family rental property and researched a number of other potential single-family rental property acquisitions. Below is a detailed description of petitioner's rental real estate activities for 2004. Petitioner husband did not participate in the rental activities during the year.

II. Petitioner's Rental Real Estate Activities for 2004

A. The Inn on Alisal Road

1. Description of the Property

One of petitioners' rental properties was on Alisal Road, about 6 or 7 miles from the couple's home. They purchased the property in 2000. The structures consisted of a 1,200-square-foot, two-bedroom, 3/4-bath (no tub) front house, built in 1949 or 1950, and a smaller back unit that had been converted from a one-car garage into a separate residential dwelling.

Petitioner named this combined property "The Inn on Alisal Road" (Inn).  As the name indicates, petitioner furnished the two units and offered them together or separately for short-term rent to overnight lodgers, usually for about 3 days at a time. Petitioner provided a coffeemaker and coffee, but guests were responsible for their own meals.  Typical guests were repeat customers, most often couples or small groups, who were in town for a wedding or other special occasion.  Petitioner rented the Inn for 48 nights in 2004, with no guests in January and February.  June was the most active month with guests on 12 nights.  Petitioner usually charged $200 or $250 per night.  She did not record the guest names in a bookkeeping journal she maintained in which she listed her receipts for the Inn by date for 2004.

2.  Petitioner's Activities

Petitioner did not employ a management company.  Instead, she operated the Inn herself.

Petitioner's onsite tasks included meeting potential guests and cleaning the interior:  Dusting, vacuuming, washing sheets, ironing, and running water to maintain the plumbing during periods when the Inn was inactive.  Petitioner also maintained the exterior, including gardening, hand watering the roses, caring for a plum tree and two cherry trees, inspecting the water drip irrigation system, taking out trash, reviewing the work of a

lawn service, and periodically cleaning leaves out of the gutters. On average during 2004, for the two units combined, petitioner spent 5 hours per week on the interior and exterior maintenance of the Inn, for a total of 260 hours for the year.[1]

Petitioner also worked offsite with respect to the Inn. She would deposit guest payments at her bank. She received telephone calls inquiring about the Inn and calls for reservations. She paid bills and reconciled the bank account. On occasion, she would wash and iron the Inn's linens in her large-capacity washer and dryer at home. She went to hardware and home improvement stores to buy replacement items, such as light bulbs, a new showerhead, and a new telephone. On average, she spent 5 hours

---

[1]For reasons explained in the discussion section below, the number of hours petitioner spent on her rental property activities is an important factor in the outcome of this case. Petitioner did not maintain a log for 2004. The regulations do not allow a postevent "ballpark guesstimate". Hill v. Commissioner, T.C. Memo. 2010-200; Carlstedt v. Commissioner, T.C. Memo. 1997-331; Speer v. Commissioner, T.C. Memo. 1996-323; Goshorn v. Commissioner, T.C. Memo. 1993-578. A log is not required, however, and an individual may establish the extent of participation in an activity by any reasonable means. Hill v. Commissioner, supra; sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). In support of petitioner's testimony, the Court received into evidence lease agreements, mortgage and closing agreements, attorney time records, litigation documents, copies of correspondence, rental car and airline receipts, third-party confirmation from a real estate agent, photographs, and other corroborating documents. Respondent did not challenge the time estimates for particular tasks. Accordingly, we base our findings for hours on this evidence, which was credible, even seemingly understated at points, but bearing against petitioner for inexactitudes of her own making. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930).

per month offsite related to the Inn, for a total of 60 hours for the year.

Petitioner spent 4 hours during the year refinancing the property. She secured a variable-rate equity loan of $220,250, initially at 5.640 percent. She used the proceeds in main part to extinguish a 10-percent fixed rate seller-financed mortgage.

### 3. Summary of Time Spent

Below is a summary of petitioner's hours with respect to the Inn.

| Activity | Hours |
|---|---|
| Interior and exterior maintenance | 260 |
| Offsite supply purchases and banking | 60 |
| Refinancing the mortgage | 4 |
| Total for the Inn | 324 |

### 4. Profitability

For the year, petitioner incurred a net loss on the Inn of $20,683. The loss consisted of $10,680 in guest receipts offset by $31,363 in expenses. Interest payments on first and second mortgages, depreciation, and property taxes were her largest expenses.

### B. The Second Street Property

### 1. Description of the Property

A second of petitioners' rental properties was on Second Street (Second Street property), about two blocks from the Inn. Petitioners purchased the property in 2000 for $292,000. Similar to the Inn, the property included two structures. The front unit

was a 1,149-square-foot, three-bedroom home, with 1-3/4 baths. The back unit was a one-car garage that petitioner converted in 2002 into a small residence with a three-quarter bath and a kitchenette.

### 2. Petitioner's Activities

As with the Inn, petitioner managed the Second Street property personally and did not employ a management company. In contrast to the short-term guests at the Inn, petitioner sought year-to-year tenants for the Second Street units.

### a. Both Units

Because petitioner sought long-term tenants, she did not have interior duties at the Second Street property to the extent she had with the Inn. Her exterior responsibilities, however, were similar, including testing the water drip irrigation system, gardening, caring for an apricot tree and a large oak tree, and reviewing the work of a lawn service. She spent 3 hours a week on exterior maintenance for a total of 156 hours for the year.

Petitioner had routine offsite financial recordkeeping duties similar to those with the Inn. She would spend 3 hours a month depositing the monthly rent payment at her bank, paying bills from her home, and reconciling the bank account, for a total of 36 hours for the year.

### b.  Back Dwelling

During 2004 petitioner rented the back unit for $1,100 per month.  Her tenant had continued the lease from 2003 but did not renew in 2004 after a sewer backup problem.  Petitioner spent a total of 20 hours during the year overseeing a plumbing contractor to correct the problem and cleaning the unit.  Within 2 months, petitioner was able to find a new tenant for the same $1,100 monthly rent.  She spent 10 hours during 2004 searching for the new tenant, showing the unit, and executing the new lease agreement.

### c.  Front Dwelling

Unusual circumstances with respect to the front unit caused petitioner to spend extra time with respect to the Second Street property during 2004.  By late 2000 petitioner's tenants in the front house noticed a mildew problem.  The tenants moved out.  They turned out to be petitioner's last tenants in the front unit.  As petitioner began stripping away layers of linoleum to determine the extent of the mildew problem, she discovered that black mold was present throughout the entire underpinning of the home.  By the end of 2001 petitioner was "at wits' end".  She eventually discovered that an earlier inspector had determined that the home has insufficient subvents.  In addition, a prior owner built an addition that blocked some of the existing subvents.  Further, the El Nino storm of 1997-98 soaked the

carpets, flooring, and walls, compounding the problem. The toxic mold infestation was so bad that petitioner was unable to provide a warranty of habitability to any prospective tenant.

In 2002 petitioners engaged an attorney to sue the prior owner and the owner's son-in-law. The son-in-law served as the agent for the seller (his mother-in-law) and for the buyer (petitioners). Petitioners claimed in main part that the prior owner and the son-in-law knew about the mold problem and did not tell them. Petitioners also named as defendants a business that performed the home inspection for their purchase and a pest control contractor that petitioner paid annually to inspect the home for termites.

During 2003 petitioner learned that even if they won the case, they might not be able to collect the judgment if the defendants did not have sufficient assets. Petitioner hired a private investigator to search for assets. During 2004, petitioner spent 30 hours conducting Internet research to assist the private investigator.

Petitioner paid her attorney $70,109 during 2004 for his work on the lawsuit. During the year, petitioner spent 15 hours periodically discussing the litigation with the attorney and reviewing documents that he sent to her. She also spent 5 hours coordinating with the attorney to determine whether the

homeowner's policy covered any part of the loss.  The insurance company denied coverage.

In 2004 the pest control contractor settled its liability for $50,000.  The home inspection business also settled, but the settlement amount is not in the record.  Following a nonjury trial in January 2005, the Superior Court of the State of California, County of Santa Barbara, awarded petitioners $135,303.81 in damages from the prior owner for "breach of contract" and the same amount in damages from the prior owner's son-in-law for "professional negligence".  In addition, the court awarded petitioners recovery of attorney's fees and costs.

Petitioner spent further time in 2004 on other activities related to the front unit.  First, because the home was vacant, she would spend an hour per week in the interior cleaning, dusting, and in maintaining the plumbing, for a total of 52 hours for the year.

Second, she spent 24 hours in 2004 planning how she would renovate the home after she received the litigation proceeds and after contractors finished gutting the interior to remove the mold and to install proper venting.  She met with representatives of the town's building department, and she drafted plans to redesign the interior.  For example, she decided to remove a wall between the kitchen and the dining room to create an open floor plan.

Third, petitioner spent 10 hours during the year driving to hardware and paint stores to buy supplies and working with movers to bring items from storage to the property.

### 3. Summary of Time Spent

The following is a summary of petitioner's hours for 2004 with respect to her activities for the Second Street property.

| Combined for Both Units | Hours |
|---|---|
| Exterior maintenance | 156 |
| Offsite bill paying and banking | 36 |
| Subtotal | 192 |

| Back Unit Only | Hours |
|---|---|
| Correct and clean sewer backup | 20 |
| Search and lease for new tenant | 10 |
| Subtotal | 30 |

| Front Unit Only | Hours |
|---|---|
| Asset investigation research | 30 |
| Litigation monitoring and support | 15 |
| Insurance coverage inquiries | 5 |
| Interior maintenance | 52 |
| Renovation planning | 24 |
| Supplies purchases and movers | 10 |
| Subtotal | 136 |

| Grand total for the Second St. property | 358 |
|---|---|

### 4. Profitability

Petitioner incurred an operating loss of $17,167 related to the Second Street property for 2004. The loss consisted of $11,000 in rent she collected on the back unit minus $28,167 in operating expenses related to both units. Mortgage interest, depreciation, supplies, and property taxes were the largest

expenses.  As noted above, petitioner also expended $70,109 in 2004 for attorney's fees related to the mold litigation for the front unit.

C.   The Existing Boise Property

1.   Description of the Property

The third of petitioners' rental properties was on Rose Hill Street, Boise, Idaho (existing Boise property).  Petitioner became interested in Boise because she found that she liked the area from visiting a brother living there and a great uncle who lived nearby.  The record is sparse about this property, other than that it was a single-family home that petitioner purchased in an earlier year and which one tenant or family rented for all of 2004.

2.   Petitioner's Activities

Petitioner operated the existing Boise property directly and did not employ a management company.  For 2004 petitioner's duties consisted solely of spending 2 hours per month, for a total of 24 hours for the year, depositing to her bank account the monthly rent check she received by mail, paying from her home occasional bills such as the annual water bill and a one-time special sewer connection charge, and reconciling the bank account.  No extraordinary events occurred during 2004 that required additional time.

### 3. Summary of Time Spent

| Activity | Hours |
|---|---|
| Bill paying and banking | 24 |
| Total for existing Boise property | 24 |

### 4. Profitability

Petitioner earned a profit of $345 related to the existing Boise property for 2004. The profit consisted of $6,000 in rent she received minus $5,655 in expenses. Mortgage interest, property taxes, and depreciation were the largest expenses.

### D. New Acquisition in Boise

### 1. Description of Property

On August 25, 2004, petitioner paid $185,000 to acquire another one-story single-family home in Boise, on a 3/4-acre lot, also located on Rose Hill Drive (new acquisition in Boise). She financed the purchase with a $166,315 mortgage and joint funds. The house, built in 1941, is a "darling" home with a wood burning fireplace, crown molding, and a brick exterior made with "clinker bricks". The main floor contains two bedrooms, one bathroom, and a small kitchen. Prior owners had converted the basement into an apartment for a person who took care of the owner. Petitioner did not begin renting the home to tenants in 2004.

### 2. Petitioner's Activities

Petitioner first found the new acquisition in Boise in April 2004 on the Internet. She researched the property online before contacting the seller's real estate agent. After a week of

telephone discussions and emails with the agent, petitioner made a formal offer for the property. Her total time through extending the offer was 10 hours.

The 20 weeks from her escrow deposit to closing was unusually time consuming for petitioner because she had not previously purchased a home from a "short sale". Petitioner's questions about zoning and the purchase difficulties caused her to speak weekly with the selling realtor. These discussions totaled 2.5 hours per week for a sum of 50 hours over the 20-week escrow period.

Petitioner also made numerous calls to representatives of the seller's bank, which was controlling the sale. In addition, petitioner spoke a number of times with a Boise representative of her own bank regarding mortgage terms. Her discussions with bankers totaled 10 hours during the year.

Petitioner flew round trip to Boise on August 11, 2004, for a walkthrough inspection of the house before closing. She left her home around 5:15 a.m., drove to the Los Angeles airport (LAX), flew to Boise, rented a car, completed the inspection, returned to the Boise airport, dropped off the rental car, flew back to LAX, and arrived at about 8:15 p.m. at the LAX parking lot. She drove to her parents' home nearby for the night, returning to her own home the next morning. In combination with

making airline and rental car reservations, petitioner devoted 25 hours to inspecting the new acquisition in Boise.

Petitioner also spent 10 hours related to the closing agreement and to planning future remodeling of the property.

### 3. Summary of Time Spent

| Activity | Hours |
|---|---|
| Pre-offer research, emails, and calls | 10 |
| Discussions with realtor during escrow | 50 |
| Discussions with banker | 10 |
| Round-trip to Boise for walkthrough | 25 |
| Closing and renovation planning | 10 |
| Grand total for new acquisition in Boise | 105 |

### 4. Profitability

Petitioner did not have income and did not report her expenses related to the new acquisition in Boise for 2004.

## E. Research of Other Potential Acquisitions

### 1. Description of Property

Petitioner researched other properties for potential acquisition in certain real estate markets that she found promising. She particularly focused on houses in Boise; the Brentwood section of Los Angeles; San Fernando Valley, California; Santa Ynez Valley, California; and Sherman Oaks, California.

### 2. Petitioner's Activities

Petitioner conducted her research on potential acquisitions primarily over the Internet. She would peruse real estate Web sites. During 2004, on 3 days each week petitioner spent an hour

conducting her Internet research, totaling 156 hours for the year.  For locations nearby she would drive through the areas to assess houses and the local market.  Her monthly research drives through neighborhoods would take 3 hours for a total of 36 hours for the year.

### 3.  Summary of Time Spent

| Activity | Hours |
|---|---|
| Internet research | 156 |
| Driving investigation of neighborhoods | 36 |
| Grand total for research of other potential acquisitions | 192 |

### 4.  Profitability

Petitioner did not receive any income and did not keep records of the expenses related to her investigation of potential property purchases in 2004.

## III.  Summary of Petitioner's Time With Respect to All of the Rental Income Properties for 2004

Below is a summary of the time petitioner spent with respect to all of her rental income properties for 2004.

| Activity | Hours |
|---|---|
| The Inn on Alisal Road | 324 |
| The Second Street property | 358 |
| The existing Boise property | 24 |
| The new acquisition in Boise | 105 |
| Researching potential acquisitions | 192 |
| Grand total for all properties | 1,003 |
| | |
| Less time spent on the Inn (see below) | (324) |
| Total hours excluding the Inn | 679 |

IV. <u>Procedural Posture</u>

Petitioners engaged Benadon, Shapiro, Villalobos, C.P.A.s, of Burbank, California, to prepare their 2004 Federal income tax return. Although the return encompassed 39 pages, relevant here are solely two items: (1) Petitioners deducted a loss of $20,683 from the Inn, which they reported on Schedule C, Profit or Loss From Business; and (2) petitioners deducted a loss of $86,931 from the other two rental properties, which they reported on Schedule E, Supplemental Income and Loss. The Schedule E loss consisted of three components: (1) The $17,167 operating loss on the Second Street property; (2) the $70,109 in attorney's fees for the Second Street property; and (3) the $345 profit on the existing Boise property. Petitioners did not report any income or expenses related to the new acquisition in Boise or from petitioner's general research into other potential real estate acquisitions.

Respondent selected petitioners' 2004 Federal income tax return for examination. Respondent allowed the $20,683 Schedule C loss for the Inn. In a notice of deficiency, however, respondent disallowed the $70,109 in attorney's fees related to the Second Street property, determining that the fees were not a currently deductible ordinary and necessary business expense. Respondent also disallowed the remaining Schedule E loss of $16,822, consisting of the $17,167 loss on the Second Street

property offset by the $345 profit on the existing Boise property. Respondent determined that the $16,822 net loss was a passive activity loss that was not currently deductible for 2004.

The disallowances caused an increase to petitioners' adjusted gross income (AGI), which in turn caused a computational phaseout of $1,466 of their itemized deductions. The adjustments and phaseout resulted in a Federal income tax deficiency of $19,358 for 2004.

Petitioners contested the adjustments in a petition to this Court. The parties stipulated that the $70,109 in attorney's fees was a capital expenditure that petitioners should add to the basis of the Second Street property. The stipulation left as the sole disputed issue whether petitioners may deduct the remaining Schedule E net loss of $16,822.

## Discussion

### I. Burden of Proof

In general, the Commissioner's determination set forth in a notice of deficiency is presumed correct, and the taxpayer bears the burden of showing that the determination is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace. Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer bears the burden of proving entitlement to any deduction claimed. Rule 142(a); INDOPCO, Inc. v.

Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, supra; Wilson v. Commissioner, T.C. Memo. 2001-139.

Pursuant to section 7491(a), the burden of proof as to factual matters shifts to the Commissioner under certain circumstances. Petitioners have neither alleged that section 7491(a) applies nor established their compliance with the substantiation and recordkeeping requirements. See sec. 7491(a)(2)(A) and (B). Petitioners therefore bear the burden of proof. See Rule 142(a).

II. Passive Losses in General

Taxpayers may deduct ordinary and necessary expenses they paid or incurred during the year in carrying on a trade or business and for the production of income. Secs. 162, 212. The Code, however, limits the deduction for losses arising from a "passive activity". Sec. 469(a).

A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). A passive activity loss is the excess of the aggregate losses from all passive activities for the year over the aggregate income from all passive activities for that year. Sec. 469(d)(1). A rental activity is generally treated as a per se passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2). A rental activity is "any activity where payments are principally for the use of tangible property." Sec. 469(j)(8).

III. Real Estate Professional

A.    Exceptions to the General Rule

There are two main exceptions to the general rule that rental activities are per se passive activities. Moss v. Commissioner, 135 T.C. __, __ (2010) (slip op. at 6). One exception applies to rental real estate activities where the individual actively participates in the activity during the year. Sec. 469(i)(1); Moss v. Commissioner, supra at __ (slip op. at 10). The maximum deductible loss under this first exception is $25,000. Sec. 469(i)(2). The $25,000 loss allowance, however, begins to phase out when AGI exceeds $100,000 and phases out completely when AGI is $150,000 or more. Sec. 469(i)(3)(A); Moss v. Commissioner, supra at __ (slip op. at 10). The stipulation to capitalize the $70,109 in attorney's fees increased petitioners' AGI from their reported figure of $104,637 to an amount exceeding the $150,000 phaseout ceiling. Consequently, the active participation exception is not available to petitioners.

The other exception is the one in controversy here. This second exception is available to "taxpayers in real property business" (real estate professionals). Sec. 469(c)(7). Rental activities of a real estate professional are not per se passive activities under section 469(c)(2). Sec. 469(c)(7)(A)(i); Moss

v. Commissioner, supra at __ (slip op. at 6); sec. 1.469-9(e)(1), Income Tax Regs.

To qualify as a real estate professional, a taxpayer must satisfy both of the following requirements:

>       (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and
>
>       (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

Sec. 469(c)(7)(B).  For couples filing "a joint return, the requirements of the preceding sentence are satisfied if and only if either spouse separately satisfies such requirements."  Id. In other words, only one spouse needs to qualify as a real estate professional to recharacterize an otherwise passive activity. Moss v. Commissioner, supra at __ (slip op. at 6-7).

B.    Application of the 750-Hour Requirement to Petitioner

Respondent does not dispute that petitioner satisfied the first requirement of materially participating in the activities. Among other qualifying factors, petitioner had no other vocation during 2004 and her involvement in the properties was regular, continuous, and substantial.  See sec. 469(h)(1); sec 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).  Therefore, the only remaining issue is whether petitioner

performed more than 750 hours of services in "real property trades or businesses" during 2004.

To compute the 750 hours, the Code treats each real estate activity as a separate activity unless the taxpayer makes an election to combine some or all of the activities. Sec. 469(c)(7)(A); Hill v. Commissioner, T.C. Memo. 2010-200; sec. 1.469-9(e)(1), Income Tax Regs. An election is binding for the year of election and for all future years in which the taxpayer qualifies. Sec. 1.469-9(g), Income Tax Regs. Respondent does not contend that petitioners failed to elect to combine all of their rental properties as one activity. Accordingly, we deem that issue conceded. See Moss v. Commissioner, supra at __ (slip op. at 7).

Respondent does contend, however, that the Inn is not a "real property trade or business" for purposes of the 750-hour test. The significance of respondent's contention is that if petitioner can include the hours she spent on the Inn, then she easily satisfies the 750-hour requirement because she spent 1,003 hours on all of her rental activities for the year. If, on the other hand, she cannot include the hours relating to the Inn, then she spent only 679 hours on her real estate activities. See table supra p. 16. She would not satisfy the 750-hour requirement, she would not qualify as a real estate professional, the two rental properties at issue would be per se passive

activities, and as a result the $16,822 net loss would not be deductible in 2004.

    C.    The Parties' Contentions

    Petitioner points to the plain language of section 469(c)(7)(C) and its legislative history[2] to contend that congressional intent and the statute itself clearly allow her to include her hours from her activities for the Inn.  The statute describes a "real property trade or business" as "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business."  Id. (emphasis added by petitioner).

    Respondent counters by pointing to a regulation that provides the following exclusion:  "an activity involving the use of tangible property is not a rental activity" for a year if, among other reasons, "the average period of customer use for such property is seven days or less" during the year.  Sec. 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).  The parties agree that the average period of the guests' use of the Inn in 2004 was 3 days.  Therefore, respondent contends that for passive activity purposes for 2004, petitioner must separate the hours spent on and the loss from the

_____

    [2]Petitioner refers to H. Rept. 103-111, at 613-614 (1993), 1993-3 C.B. 167, 189-190.

Inn from her other rental real estate activities hours and net
loss.

D.    The Court's Prior Opinion in Bailey

To support his position, respondent points to an opinion of
this Court, Bailey v. Commissioner, T.C. Memo. 2001-296 (no
relation to petitioners), which involved a similar set of facts.
Because petitioner also focuses on the Bailey opinion, we detail
below the facts and holding of that case.

In Bailey the taxpayers, husband and wife, were licensed
attorneys.  In 1997, the pertinent year at issue, they also owned
and taxpayer wife (taxpayer) participated in the operation of
five real estate properties at three locations:  (1) The Lake
Arrowhead property (a single-family house); (2) the Indian Wells
properties (a condominium and a unit in a planned development);
and (3) the Elderwood properties (two four-plex buildings).  The
taxpayer also spent 104 hours on general real estate activities
not associated with any one particular property.  The taxpayer
rented the Lake Arrowhead property to customers in 1997 for
periods averaging less than 4 days.

The taxpayers had made a previous election to group the
properties as one activity.  Each of the properties generated a
loss for 1997.  The taxpayers combined them and deducted the
losses on Schedule E of their 1997 Federal income tax return.

The Commissioner determined that the taxpayer could not combine her hours on the Lake Arrowhead property with her hours on the other two rental properties because the rental period for the Lake Arrowhead property was less than the 7-day threshold of section 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., supra. Accordingly, the Commissioner disallowed the taxpayers' losses from all three of their rental properties.

Specifically with respect to disallowing the loss from the Lake Arrowhead property, the Commissioner determined that the taxpayer did not establish that she materially participated in operating the property in part because she engaged a management company to operate the property and in part because she had significant outside activities as an attorney.  Pertinent here, the Commissioner also disallowed the losses on the taxpayer's other two rental properties because the taxpayer did not establish that she expended more than 750 hours of personal services on these other two properties, including her time on general rental real estate activities but excluding her time on the Lake Arrowhead property.

The taxpayer contended that she qualified as a real estate professional for 1997 because when she included the Lake Arrowhead property, she met the two requirements of section 469(c)(7)(B); namely:  (1) She performed more than one-half of her personal services for the year in real property trades or

businesses; and (2) she performed more than 750 hours in real property trades or businesses in which she materially participated. Therefore, according to the taxpayer, she and her husband were entitled to deduct the losses from all of their rental properties because she was a real estate professional for the year.

The Court sustained the Commissioner's disallowance of all of the taxpayers' rental real estate losses for 1997 because: (1) The taxpayer did not materially participate in the Lake Arrowhead property; and (2) relevant here, after excluding the taxpayer's time on the Lake Arrowhead property because of its short--less than 7 days--average rental period, the taxpayer did not have more than 750 hours in personal services on the other properties to qualify as a real estate professional. In summary, the short rental period made the Lake Arrowhead property a trade or business, not a rental real estate activity.

E.   Applying Bailey to Petitioner's Facts and Circumstances

Petitioner distinguishes her facts and circumstances from those of the taxpayer in Bailey. Petitioner emphasizes that she materially participated in the operation of the Inn, a point with which respondent agrees, whereas the taxpayer in Bailey did not materially participate in the operation of the Lake Arrowhead property. From petitioner's viewpoint, her material participation in the Inn in 2004, in combination with the clear

and unambiguous plain language of section 469(c)(7)(C), requires the inclusion of the hours she spent operating the Inn for purposes of the 750-hour test. In other words, petitioner contends that a taxpayer is entitled to include all real property trades or businesses in which the taxpayer materially participated during the year for purposes of computing the 750-hour requirement for a real estate professional. We disagree.

The Court in Bailey addressed this exact issue, in two portions of the opinion. We quote extensively below from Bailey to resolve any doubt. The first excerpt below comes from the portion of the opinion where the Court was deciding whether the taxpayer met the 750-hour test to be a real estate professional, as follows:

> Whether petitioner qualifies as a real estate professional under section 469(c)(7) is based on petitioner's activities related to the Indian Wells condominium, Indian Wells unit, and Elderwood properties. Petitioners argue that the Lake Arrowhead property is rental real estate that should be included in determining whether petitioner is a real estate professional. We disagree.

> Petitioner's activities that are related to the Lake Arrowhead property are disregarded for purposes of determining whether she was a real estate professional, because the Lake Arrowhead property is not "rental real estate" as defined in section 1.469-9(b)(3), Income Tax Regs. Section 1.469-9(b)(3), Income Tax Regs., defines "rental real estate" as "any real property used by customers or held for use by customers in a rental activity within the meaning of section 1.469-1T(e)(3)." Section 1.469-1T(e)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), states that, except as otherwise provided, an activity is a "rental activity" for a taxable year, if "during such taxable year,

tangible property held in connection with the activity is used by customers or held for use by customers". See also sec. 469(j)(8). As provided in section 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., supra, an "activity involving the use of tangible property is not a rental activity for a taxable year if for such taxable year * * * [the] average period of customer use for such property is seven days or less".

The average period of customer use for the Lake Arrowhead property was less than 7 days during 1996 and 1997. Thus, the rental of the Lake Arrowhead property is not a "rental activity" as defined in section 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., supra, not "rental real estate" under section 1.469-9(b)(3), Income Tax Regs., and not included in the election under section 469(c)(7) to treat all interests in rental real estate as a single rental real estate activity. See Scheiner v. Commissioner, T.C. Memo. 1996-554 (where average period of customer use less than 7 days, condominium hotel activity was not rental activity under section 469(j)(8) and not considered a passive activity under section 469(c)(2)); Mordkin v. Commissioner, T.C. Memo. 1996-187.

Accordingly, petitioner's attempt to distinguish her situation because she materially participated in operating the Inn is misplaced. Petitioner misapprehends the significance of material participation. As noted supra p. 20, material participation is significant for determining whether a trade or business is a passive activity. For example, the taxpayer in Bailey did not materially participate in operating the Lake Arrowhead property. Consequently, because the Lake Arrowhead activity was not a rental activity under section 469(c)(2), but rather a trade or business in which the taxpayer did not materially participate under section 469(c)(1), the Lake Arrowhead activity was a passive activity; and therefore the

Commissioner disallowed the losses.  As applied here, as noted supra pp. 17-18, respondent allowed petitioner's year 2004 Schedule C loss for the Inn because she materially participated in the activity during the year.

The above excerpt from <u>Bailey</u> illustrates this point.  When a taxpayer spends time on a real estate property that the taxpayer rents for periods averaging less than 7 days, that property is no longer a "rental activity".  Therefore, the taxpayer must exclude or "disregard" the time he or she spent on the property for purposes of counting hours for the 750-hour section 469(c)(7)(B)(ii) test to be a real estate professional.

Further, as if in anticipation of petitioner's contentions, the Court in <u>Bailey</u>, in a later portion of the opinion, stated the following in discussing whether the taxpayer could separately deduct the loss on the Lake Arrowhead property as a Schedule C business loss:

> Petitioners argue that they properly filed an election pursuant to section 469(c)(7)(A)(ii) to treat all of their interests in rental real estate as a single rental real estate activity and that their activities related to the rental of their Lake Arrowhead property should be considered in aggregate with their other rental properties.  As previously explained, petitioners' argument fails because the election to treat all rental properties as one activity is limited to the purpose of determining whether a taxpayer is a real estate professional under section 469(c)(7).  Here, the average period of use of the Lake Arrowhead property was less than 7 days in 1996 and 1997; thus, the rental of the Lake Arrowhead property is not a rental activity as defined in section 469(j)(8) and is not a passive activity under section

469(c)(2).  See <u>Scheiner v. Commissioner</u>, <u>supra</u>;
<u>Mordkin v. Commissioner</u>, <u>supra</u>. * * *

We reiterate the holding in <u>Bailey</u> that a rental property with average use of less than 7 days is not an activity that a taxpayer can include in computing the more than 750 hours of services that a taxpayer needs to qualify as a real estate professional under section 469(c)(7)(B)(ii).

The rationale for segregating petitioner's hours is consistent with the disparate reporting of the activities.  The Inn activity is reported on Schedule C because managing a property with a short rental period is akin to running a business.  The other rental real estate activities are reported on Schedule E as a separate and distinct activity and generally fall within the purview of section 212.

The statute's legislative history reinforces this rationale, though not as petitioner suggests.  A 1986 Senate Finance Committee report, in explaining the then-new passive activity loss rules, provided the following clarification:  "A passive activity is defined under the bill to include any rental activity, whether or not the taxpayer materially participates. However, operating a hotel or similar transient lodging, for example, where substantial services are provided, is not a rental activity."  S. Rept. 99-313, at 720 (1986), 1986-3 C.B. (Vol. 3) 1, 720.

IV.  Conclusion

In summary, the 679 hours petitioner spent in 2004 on all of her rental real estate activities excluding the Inn are not more than the 750 hours that section 469(c)(7)(B)(ii) requires for petitioner to qualify as a real estate professional. Consequently, these other activities are per se passive under section 469(c)(2).  We therefore sustain respondent's disallowance for 2004 of petitioners' combined net loss of $16,822 from their Second Street property and their existing Boise property.

We have considered all of petitioners' contentions and arguments that are not discussed herein, and we conclude they are without merit, irrelevant, and/or moot.

To reflect the foregoing,

Decision will be entered

under Rule 155.